**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **HEATHER HALBACH &** | ) | |
| **BARBARA SCHIELD, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 05CV2399 (ERW)** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **GREAT-WEST LIFE & ANNUITY** | ) | |
| **INSURANCE COMPANY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Plaintiffs' Motion for Summary Judgment.  Come now

Plaintiffs, by attorneys, and state the following in support of said Motion:

**I.      COUNT I:  DENIAL OF BENEFITS IN VIOLATION**
**OF ERISA, THE PLAN AND FIDUCIARY DUTY**

**A.      OVERVIEW**

For decades prior to 2005, Defendants provided disabled plan participants medical,

dental, vision, prescription drug and life insurance benefits on terms equal to active employees.

Defendants eliminated such benefits for disabled plan participants effective January 1, 2005.

Plaintiff Barbara Schield brings a claim on behalf of herself and the certified class for

eliminating vested benefits in violation of ERISA, plan documents, and fiduciary duty (Count I).

Previously, Defendants filed three (3) consecutive motions to dismiss in which they

asserted multiple legal arguments for dismissing Plaintiffs' claims.  This Court rejected such

arguments, held that Plaintiffs have stated claims, and expressly declared that Plaintiffs will have

an opportunity to present extrinsic evidence supporting Count I.  Further, this Court expressly

determined that it is "clear" from the Plan "that some benefits do become vested under the Plan."

1

That is a decided issue.  Therefore, the issue now before the Court is, "What benefits vested?".

The litany of extrinsic evidence presented below overwhelmingly establishes that health, dental, vision, prescription drug and life insurance benefits vested during the entire term of plan participants' long-term disability.  That evidence is uncontroverted and there remains no genuine issue of material fact preventing summary judgment in favor of Plaintiffs and the certified class.

## B.     RELEVANT PRIOR RULINGS[1]

On June 6, 2006, this Court held:

> **In this case, the reservation of rights clause and termination clause both have qualifying language which dictates that if a participant is already 'entitled' to receive benefits, any modification or termination of benefits will not apply to that participant.  It is clear from this language that some benefits do become vested under the Plan**.  Defendants argue that benefits become vested only after a claim is made for a particular medical service.  Plaintiff argues that a right to medical benefits vests upon the determination that participant is disabled.  For purposes of Defendants' instant Motion the Court finds that the reservation of rights and termination provisions are not facially unambiguous.  Because the provisions are not facially unambiguous, the Court holds that Plaintiff has stated a claim.  Further interpretation of the Plan and other extrinsic evidence is not proper at the motion to dismiss stage.  Thus, Defendants' Motion relating to whether medical benefits have vested will be denied.

Halbach vs. Great-West, et al., 2006 U.S. Dist. Lexis 36816, at *15-16 (E.D. Mo. 2006)

(emphasis added).

On November 21, 2006, May 29, 2007, July 18, 2007 and September 12, 2007, this Court four (4) times reiterated its holdings that the Plan terms are ambiguous and extrinsic evidence should be considered in resolving the ambiguity.  Halbach & Schield vs. Great-West, et al., 2006 U.S. Dist. Lexis 84591, at *2 (E.D. Mo. 2006); Halbach & Schield, et al. vs. Great-West, 2007

---

[1] The law of the case doctrine applies.  See St. John's Mercy Med. Center v. Delfino, 2006 U.S. Dist. Lexis 13844, at *13 (E.D. Mo. 2006) (opinion by Hon. E. Richard Webber) ("The doctrine of the law of the case prevents the relitigation of settled issues in an action, thus protecting the expectations of the parties, ensuring uniformity of decisions and promoting judicial efficiency. The doctrine of the law of the case precludes litigation of matters that are decided implicitly, as well as those decided explicitly.")

U.S. Dist. Lexis 38801, *8 (E.D. Mo. 2007); Halbach & Schield, et al. vs. Great-West, et al.,

2007 U.S. Dist. Lexis 52086, at *2 (E.D. Mo. July 18, 2007); Clerk's Doc. # 173, p. 1. [2]

    Recently, Defendants challenged the relevance of communications of the Plan's

representatives regarding the duration of health insurance and other welfare benefits to disabled

plan participants who, for whatever reason, did not become class members.  In their written and

oral arguments to the Court, Defendants likewise challenged the relevance of communications by

Plan representatives to class members regarding the duration of such benefits.  On September 12,

2007, this Court held, "The Court finds that the documents sought by Plaintiffs **are relevant** to

the issues to be decided by the Court and therefore, subject to discovery."  Clerk's Doc. # 173,

pp. 2-3 (emphasis added).  Based on a weighting of benefit versus effort, this Court ordered

Defendants to produce documents containing statements by the Plan's representatives regarding

the duration of welfare benefits during long-term disability which were issued since 1995.  Id.

### C.    EVIDENCE BEFORE THE COURT

### 1.    PLAN LANGUAGE

    As this Court has determined, Section 5.1 of the Plan, entitled "Amendment of Plan,"

expressly acknowledges that some welfare benefits do vest and may not be discontinued or

reduced by Defendants.  That Section states:

> The Company reserves the right at any time or times to amend the provisions of the Plan to any extent and in any manner that it may deem advisable, by a written instrument signed by an officer of the Company; **provided, however, that no such modification**

---

[2] Defendants have repeatedly tried to distinguish between this Court's phrasing "not facially unambiguous" in its June 6, 2006 Order and a finding of ambiguity in the Plan terms.  However, this Court's November 21, 2006, July 18, 2007 and September 12, 2007 Orders expressly state that this Court finds the operative terms to be "ambiguous."  2006 U.S. Dist. Lexis 84591, at *2; 2007 U.S. Dist. Lexis 52086, at *2 & *7 n.1; Clerk's Doc. # 173, p. 1.  For example, the July 18, 2007 Order holds "the terms of the plan at issue in the case at bar are ambiguous."  2007 U.S. Dist. Lexis 52086, at *7 n.1.  Thus, Defendants' attempted distinction is without merit.  This Court has already found ambiguity.

**shall divest a Participant of benefits under the Plan to which he has become entitled prior to the effective date of the amendment**.  Ex. 1, p. 10 (emphasis added).

Also, as this Court has previously held, Section 5.2 of the Plan, entitled "Termination of Plan," also acknowledges that some welfare benefits provided under the Plan vest as follows:

> The Company has established the Plan with the bona fide intention and expectation that it will be continued indefinitely, but the Company has no obligation whatsoever to maintain the Plan in whole or in part for any given length of time and may terminate the Plan in whole or in part by a written instrument signed by an officer of the Company at any time without liability; **provided, however, that such termination shall not divest a Participant of benefits under the Plan to which he has become entitled**.  Id. (emphasis added). [3]

Section 2.3 of the Plan states, "Coverage for an individual under this Plan as a Participant or a Dependent shall terminate **as set forth in the SPD, except to the extent otherwise specifically provided herein**."  Ex. 1, p. 3 (emphasis added).  Thus, the terms of the Plan, not the SPD, ultimately govern what benefits Defendants may or may not eliminate.  Id.

Section 3.1 of the Plan provides that one looks to the summary plan description (hereinafter "SPD") to determine the benefits available.  Ex. 1, p. 6.

## 2.      SPD BENEFITS LANUAGE (INCORPORATED INTO PLAN)

Defendants produced SPD's covering health, dental, vision and prescription drug benefits dating back to 1991.  The 1991 through 1993 SPD's are similar.  The 1991 SPD clearly states:

**What Happens to My Other Benefits When I Am Approved For the Monthly LTD Benefit?**
When you are approved for the monthly LTD Benefit:
- Your group life insurance will continue without further premium payment by you;

---

[3] Plan amendment is only valid if it conforms to the written plan terms.  Curtiss-Wright vs. Schoonejongen, 514 U.S. 73 (1995).   Here, the Plan requires amendment by "a written instrument signed by an officer of the Company."  In requests 13 through 18 of Plaintiffs' Second Request for Production of Documents to All Defendants, Plaintiffs requested all such amendments.  Ex. 5, para. 2; Ex. 87, pp. 7-8.  Defendants have not produced any amendment changing the reservation of rights provision, the termination provision or the vesting language contained therein either before, around or after the date of the sole Plan document produced.  Thus, it appears that such language has always been a part of the Plan.

4

- You may continue your group health, dental and vision care benefits but you will have to continue to pay your share of the required premiums for these benefits;
- Your LTD insurance will continue without further premium payments by you; and
- Your pension benefits will continue to accumulate.  For details, please refer to the Pension Plan description in this Handbook.

**These benefits will continue until the Period of Disability ends or you retire whichever is earlier**.  Ex. 2, Bates p. 6590 (emphasis added).

The 1992 and 1993 SPD's similarly provide:

**What Happens To My Other Benefits When I Am Approved For the Monthly LTD Benefit?**
When you are approved for the monthly LTD Benefit:

- Your group life insurance will continue without further premium payment by you;
- You may continue your group health, dental and vision care benefits but you will have to continue to pay your share of the required premiums for these benefits;
- You may continue your Dependent Group Life and or Accidental Death and Dismemberment Insurance but you will have to continue to pay your share of the required premiums;
- Your LTD insurance will continue without further premium payments by you; and
- Your pension benefits will continue to accumulate.  For details, please refer to the Pension Plan description in this Handbook.

**These benefits will continue until the Period of Disability ends or you retire, whichever is earlier**.  Ex. 3, Bates pp. 6647-48; Ex. 4, Bates p. 6755.

The 1991 through 1993 SPD's further state:

**How Does Salary Continuance Affect My Other Benefits?**
Time off from work during Salary Continuance does not constitute a break in service in determining benefits.  Your benefits continue during the period of Salary Continuation. **Even if you do not qualify for Salary Continuance, your benefits are continued during your period of disability.  In either case, you are still responsible for payment of your share of the premiums for your other benefits**.

**What Happens If I Become Disabled, But Do Not Qualify For Salary Continuance?**
**If you become disabled but do not qualify for Salary Continuance, your benefits are continued during your period of disability**.  Your share of the benefit cost is deducted from the first paycheck you receive upon your returning to work or you may make payment to the Company on a regular basis.  In addition, you will be required to provide medical information to the Company. Ex. 2, Bates p. 6584 (emphasis added); Ex. 3, Bates 6641 (emphasis added); Ex. 4, Bates p. 6751 (emphasis added).

The form and appearance of Defendants' SPD changed in 1994.  However, Defendants

produced no plan amendment adopting any substantive change in the plan from the 1993 version

5

of the SPD to the 1994 version of the SPD, although such amendments were specifically

requested by Plaintiffs.  Ex. 5, paras. 2 - 3 & attachments thereto.[4]

At least six (6) versions of the SPD in effect from 1994 through 2001 all state:

**Can I Continue Benefits If I Become Ineligible for Coverage under This Plan?**
You may be able to continue certain benefits even if you would otherwise become
ineligible for coverage under this Plan.
These are the categories of coverage available.
- Continuation Coverage - You receive the same benefits you were entitled to as an
  Employee at the same cost to you, if any.
Ex., 6 Bates p. 39; Ex. 7, Bates p. 186; Ex. 8, Bates p. 340; Ex. 9, Bates p. 497; Ex. 10,
Bates p. 649; Ex. 11, Bates p. 3673.

Under the immediately following heading, "Continuation Coverage," the 1994 through

2001 versions of the SPD provide in pertinent part:

With continuation coverage, the same benefits you were entitled to as an Employee will
continue at the same cost to you, if any.
If you become ineligible because your Service terminates for one of the following
reasons, you will receive continuation coverage:
- Illness;
- Leave of absence;
- Temporary layoff.
The following chart shows the length of time certain benefits are available under
continuation coverage.

| Length of Time Continuation Coverage Provides Benefits | |
|---|---|
| **Loss of Coverage Due to Illness** | |
| Medical, Prescription Drug, Dental and Vision Benefits | If a person has been approved for LTD benefits, coverage continues during the course of the total disability |
| Life Benefits | If a person has been approved for LTD benefits, coverage continues during the course of the total disability |

*****
Your continuation coverage will end sooner than stated above if you fail to pay for this
continuation coverage.  Ex. 6, Bates pp. 39-40; Ex. 7, Bates p. 187; Ex. 8, Bates p. 340;
Ex. 9, Bates p. 497; Ex. 10, Bates p. 650, Ex. 11, Bates p. 3674.

---

[4] See fn. 3 above.  Defendants have not produced any amendment changing the language of the
1993 SPD to the language of the 1994 SPD.  Ex. 5, paras. 2-3.  As Defendants have not produced
any such amendment, the 1991 through 1993 SPD language continued in effect through at least
2004 (and actually to date).

The 2004 version of the SPD, under the heading, "Can I Continue or Convert my

Coverage If I Become Ineligible?," states:

> If you become ineligible for coverage under the Plan, you may be able to continue coverage for certain benefits.
> <u>Continuation of Life Insurance, Medical, Prescription Drug, Dental, and Vision Benefits during an Illness or Absence</u>
> If your Service ends due to Illness and you have been approved for LTD benefits, coverage will continue during the course of the total disability.
> Your coverage will end sooner than stated above if you and/or your employer fails to pay for this continuation coverage.  Ex. 12, Bates p. 800 (emphasis in original).[5]

Around 2002 or 2003, Great-West issued a document entitled, "Great-West Life Salary

Continuance Program, Effective July 1, 2002." Ex. 13, para. 5 & attachment thereto.  That

document states:

> ▪ **How Does Salary Continuance Affect My Other Benefits?**
> Your benefits are continued during your period of Disability, provided you continue to pay your contributions for all other benefits.  <u>Id</u>., p. 10.

The SPD's define "total disability" as follows:

> ▪ **How Does Salary Continuance Affect My Other Benefits?**
> Your benefits are continued during your period of Disability, provided you continue to pay your contributions for all other benefits.
> • During the 6 month LTD waiting period and the first 24 months following the waiting period, "Total Disability" means being under the care of a Doctor and prevented by Illness from performing each of the essential functions of your regular occupation.
> • After that, "Total Disability" means being under the care of a Doctor and prevented by Illness from working for pay, profit, or gain at any job for which you are suited by education, training or experience.  Ex. 6, Bates p. 126, Ex. 7, Bates p. 276; Ex. 8, Bates p. 431, Ex. 9, Bates p. 583, Ex. 10, Bates p. 730, Ex. 11, Bates p. 3788; Ex. 12, Bates p. 835.

---

[5] See fn. 3 above.  Defendants have not produced any amendment changing the 2003 SPD language regarding continuation of welfare benefits during disability to the 2004 SPD plan language regarding continuation of benefits through disability, although such documents were requested in discovery.  Ex. 5, paras. 2 - 3.

The SPD's also specify the length of long-term disability benefits as follows:

**How Long Will My Benefits Continue?**
Your benefits will continue until the earliest of these dates:
- The date you are no longer Totally Disabled;
- The date you fail to give proof of your disability as required;
- The last day of the calendar month in which the maximum benefit period ends as shown below.
- The date of your retirement.  Ex. 6, Bates p. 127, Ex. 7, Bates p. 277; Ex. 8, Bates p. 432, Ex. 9, Bates p. 584, Ex. 10, Bates p. 731, Ex. 11, Bates p. 3790; Ex. 12, Bates p. 836.

Like Section 2.3 of the Plan itself, the SPD's also provide that the terms of the SPD's are subject to the terms of the Plan document.  Specifically, those SPD's state, "The booklet [SPD] is subject to the rules, regulation, and provisions of the Plan, as approved by the Board of Directors."  Ex. 2, Bates p. 6552; Ex. 4, Bates p. 6715; Ex. 6, Bates p. 31, Ex. 7, Bates p. 176; Ex. 8, Bates p. 331, Ex. 9, Bates p. 636, Ex. 10, Bates p. 484, Ex. 11, Bates p. 3652.

### 3.   <u>EXTRINSIC EVIDENCE</u>

#### a.   <u>DEFENDANTS' "TEMPLATE" LETTERS</u>

From 1991 (and possibly earlier) through 2004, Defendants informed plan participants who may become entitled to long-term disability benefits through "template" letters that:

**<u>The date that you are no longer eligible for Long Term Disability benefits is the date that your benefit coverages also terminate</u>**.  At that time, you have the option of continuing your Health, Dental and Visioncare coverage under COBRA. [6]

---

[6] In <u>Barker vs. Ceridian (Barker II)</u>, 193 F.3d 976 (8th Cir. 1999), the Eighth Circuit considered testimony that the defendants' representatives told plan participants that they could not lose the health benefits once they were disabled.  <u>Id.</u>, 193 F.3d at 979-83.  The Eighth Circuit further explained:

"Informal statements by an employer's representatives about benefits do not legally alter an ERISA plan, which is required by statute to be written.  <u>Jensen</u> [vs. SIPCO], 38 F.3d [945] at 949 [(8th Cir. 1994)].  "'ERISA precludes oral or informal amendments to a plan, by estoppel or otherwise.'  <u>Palmisano vs. Allina Health Systems, Inc.</u>, 190 F.3d 881, 1999 U.S. App. Lexis 21652, 1999 WL 701503 at *5 (8th Cir. 1999) (quoting <u>Houghton vs. SIPCO</u>, 38 F.3d 953, 958 (8th Cir. 1994)).  **<u>However, in a case involving ambiguous written instrument, the contemporaneous interpretation of the instrument by the</u>**

Exs. 14 - 18 (emphasis added).  None of these letters qualifies such promise of benefits through the end of disability by informing participants that such promise is subject to amendment.  <u>Id</u>.

Defendants produced twenty-nine (29) "template" letters to various class members dated from March 1, 2001 through November 20, 2002.  Ex. 14.  Those letters expressly identify their own purpose in the introductory remark, "The purpose of this letter is to explain the effect that placement on Long Term Disability will have on your employment and benefits with Great-West Life."  <u>Id</u>.  The letters proceed to represent, "Your benefit coverages will continue if approved for LTD benefits."  <u>Id</u>.  Then, those letters state:

> **<u>The date that you are no longer eligible for Long Term Disability benefits is the date</u>**
> **<u>that your benefit coverages also terminate.  At that time, you have the option of</u>**
> **<u>continuing your Health, Dental and Visioncare coverage under COBRA</u>**.  <u>Id</u>.
> (emphasis added).

---

**employer is relevant evidence as to the settlor's intent.**  <u>Fink vs. Union Cent. Life Ins.</u>
<u>Co.</u>, 94 F.3d 489, 492 (8th Cir. 1996); see <u>Jensen</u>, 38 F.3d at 951.
<u>Barker II</u>, 193 F.3d at 982 (emphasis added).  The Eighth Circuit recognized that such statements of plan representatives around the time that the SPD's were issues was relevant.  <u>Id</u>., at 983.  On September 12, 2007, this Court found that statements by the plan's representatives regarding the duration of benefits are "relevant" to the issue before this Court and, based on a weighting of likely benefit versus effort, ordered Defendants to produce documents containing such statements made since 1995.  Clerk's Doc. # 173, pp. 2-3; see also, 11 S. Williston, Law of Contracts Sec. 30:7 (4th ed. 1999) (in the context of interpreting ERISA plan language or contract terms, extrinsic evidence includes "the parties' conduct, the statements of its representatives, and past practice."); <u>Reardon vs. Kelly Services, Inc.</u>, 210 Fed. Appx. 456, 462 (6th Cir. 2006) (same); <u>Hacala vs. Spencer Gifts, LLC</u>, 2006 U.S. Dist. Lexis 57412, at *20 (D.N.J. 2006) ("Extrinsic evidence in ERISA context may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.").  Herein, Plaintiffs produce an abundance of both written and verbal statements by the Plan's representatives, from all levels including the benefit department employees through benefit managers through the Plan Administrators themselves which all show Defendants' understanding of the pertinent terms.  These statements span from before the time Defendants began to issue the relevant SPD's in 1991 through 2004.  These SPD's also cover well before, during, and after 1997, the year in which Defendants issued the only formal Plan document which has been produced.  Statements of settlors regarding changes to plan terms and the effect of the new Plan language are equally, or more, important as statements of original intent in drafting the plan when the new terms are to be construed.

Defendants produced another forty-seven (47) letters dated from December 18, 2002 through November 30, 2004.  Ex. 15.  Those letters begin, "The purpose of this letter is to notify you of your eligibility to apply for Long Term Disability ("LTD") benefits and to explain the effect that placement on the LTD will have on your employment and benefits with Great-West Life."  Id.  All those letters represent under the heading "Health and Life Benefits:"

> ***Health and Life Benefits***
> If approved for LTD benefits the current health and life coverages you are enrolled in will continue.  However, your current benefit coverages will terminate effective the date your employment terminates.  A COBRA notice will be issued and mailed under separate cover to your home address.  If your LTD benefits are approved your coverages will be reinstated and insurance premiums will be deducted from your LTD check.  Your Group Life Insurance premiums will be waived.
>
> **The date that you are no longer eligible for LTD benefits is the date that your benefit coverages also terminate.  At that time, you have the option of continuing your Health, Dental and Visioncare coverage under COBRA**.  Id. (emphasis added).

Plaintiffs obtained similar letters from class members dating as far back as 1991 which containing the same representation regarding continuation of health insurance and other welfare benefits through the entire period of long-term disability.  Exhibits 16 - 19.  For example, 1991 letters from Defendants to class members Carol Boytim and Debra Smith both state, "The purpose of this letter is to explain the effect that placement on the Long Term Disability Plan will have on your employment and benefits with Great-West Life."  Ex. 16 para. 5 & attachment thereto; Ex. 17, para. 5 & attachment thereto.  Then, those two (2) letters promise and represent:

> Your current benefit coverages would remain in effect, provided required premiums are paid.  The one exception is the Group Life insurance premium which would be waived.  Our records show that you have the following benefits and premium amounts:
>
> | Benefit | Monthly Premium |
> |---|---|
> | Single Health, Dental & Visioncare | $17.50 |
>
> This amount would be deducted from your Long Term Disability checks.
>
> **The date that you are no longer eligible for Long Term Disability benefits is the date that your benefit coverages also terminate.  At that time, you have the option of**

**continuing your Health, Dental and Visioncare coverage under COBRA and converting your Long Term Disability to an individual policy**.  Id. (emphasis added).

The 1995 "template" letter to class member Barbara Horner likewise represents:

Your current benefit coverages will remain in effect, provided required premiums are paid.  The one exception is the Group Life insurance premium which will be waived. Our records show that you have the following benefits and premium amounts:

Benefit                                              Monthly Premium
Health, Dental and Vision Coverage          21.00
This amount will be deducted from your Long Term Disability checks.
**The date that you are no longer eligible for Long Term Disability benefits is the date that your benefit coverages also terminate.  At that time, you have the option of continuing your Health, Dental and Visioncare coverage under COBRA and converting your Long Term Disability to an individual policy**.  Ex. 18, para. 5 (emphasis added).

A 1996 letter from Defendants to class member Lynn Conforti likewise states:

**The date that you are no longer eligible for Long Term Disability benefits is the date that your benefit coverages also terminate.  At that time, you have the option of continuing your Health, Dental and Visioncare coverage under COBRA and converting your Long Term Disability to an individual policy**.  Ex. 19, para. 5 and attachment thereto (emphasis added).

Although these letters explain that the promise to continue benefits until the end of long-term disability is subject to payments of premiums and end of disability, none of these consistent "template" letters, spanning from 1991 to 2004, states that the express promise to continue health insurance or other welfare benefits through disability is subject to amendment of the Plan.  Exs. 14 -18.  Defendants would have surely included such an important qualification if it actually existed if, for no other reason, for their own protection.

Defendants' former Plan Administrator George Jelfimow testified that, as far as he knows, every "template" letter said that as long as a participant is on long-term disability, he or she will also get employee health insurance until he or she dies, retires, or is no longer disabled, with the "proviso" that the plan member continues to pay the premiums.  Ex. 20, p. 28.  Mr. Jelfimow assumed that letter was being sent to plan participants during his tenure, but he never

caused the language regarding length of health and other benefits to be changed in any way.  Ex. 20, pp. 28-29.  Mr. Jelfimow also discussed that language of the "template" letters with Defendants' employees including the underwriter, members of the benefits committee, and members of his staff.  Ex. 20, pp. 30-31.  However, he does not recall telling anyone that such language of the "template" letter was in error.  Ex. 20, pp. 30-31.

Jennifer Sward, who was Defendants' benefits supervisor, testified that she revised the "template" letters from time to time using the material communicated to her from Defendants' benefits approval committee meetings.  Ex. 21, pp. 12-13.  She stated, "If there was a decision made that would impact what was said in those letters, we would update that based on the material provided."  Ex. 21, p. 13.  Those changes to the "template" letters were reviewed by management including Donna Thompson, the benefits manager, and Chelle Dillabough who is the current plan administrator.  Ex. 21, pp. 16 & 53.  Ms. Sward never changed the "template" letter to state that the promised duration of benefits was subject to Plan amendment and she never recommended such a change to the "template" letters.  Ex. 21, p. 26.  She testified that the people who approved changes to the "template" letters also had the power to change those letters to state that health benefits could be eliminated through plan amendment.  Ex. 13, p. 44.

The template letters are carbon copied to various recipients.  Exs. 14 - 20.  Benefits employee Amy Olschner identified the persons carbon copied on a "template" letter as the plan participant's manager and the person in charge of long-term benefits.  Ex. 22, p. 18.

In sum, the evidence shows that the promises and representations set forth in the "template" letters regarding the duration of health insurance and other benefits until the end of long-term disability were known to Defendants and their employees, including the highest-ranking management and benefit executives.  Yet, the uncontroverted evidence establishes that

nobody took action to eliminate or qualify such promises for at least fourteen (14) years.  This clearly shows Defendants' understanding of the Plan's terms.

Even well <u>after</u> the purported amendment eliminating benefits of disabled plan participants and long after this suit was filed, Defendants have sent more "template" letters to plan participants indicating that Defendants interpreted the relevant Plan language to confer vesting of life insurance benefits for the entire period of long-term disability.  For example, on or about July 22, 2005, Linda Gordian, Defendants' Senior Disability Consultant of Group Life & Disability Benefits, sent a "template" letter to plan participant Jeryl Dunn representing:

> Our records indicate that your Group Life Insurance benefit of $[omitted], is being kept in force premium free under the Waiver of Premium provisions of your Plan.  **This Waiver of Premium benefit is available to you while you continue to meet the definition of Total Disability as stated in your LTD Plan, but not beyond your Normal Retirement Date**.  Ex. 87, para. 5 & attachment thereto (emphasis added).

That letter was carbon copied to Jennifer Sward, Defendants' Compensation & Benefit Supervisor.  <u>Id</u>.  Notably, prior to the purported amendment in late 2004, the same plan terms applied to life insurance benefits, health insurance benefits and other welfare benefits during long-term disability.  Ex. 2, Bates pp. 6590, 6621 & 6584; Ex. 3, Bates pp. 6647-48, 6694 & 6641; Ex. 4, Bates pp. 6755 & 6751; Ex., 6 Bates pp. 39-40; Ex. 7, Bates pp. 186-87; Ex. 8, Bates pp. 340; Ex. 9, Bates pp. 497; Ex. 10, Bates pp. 649-50; Ex. 11, Bates pp. 3673-74; Ex. 12, Bates p. 800.

Over a year later, on September 13, 2006, Ms. Gordian sent the same form letter to class member Karen Hutchins and almost another year after that, Ms. Gordian sent the same form letter to class member Barbara Horner on May 25, 2007.  Both of those letters state:

> Our records indicate that your Group Life Insurance benefit of $[omitted], is being kept in force premium free under the Waiver of Premium provisions of your Plan.  This Waiver of Premium benefit is available to you while you continue to meet the definition

of Total Disability as stated in your LTD Plan, but not beyond your Normal Retirement Date.  Ex. 23, para. 5 & attachment thereto; Ex. 24, para. 5 & attachments thereto.

Again, the same Plan terms applied to life insurance during disability as applied to the other welfare benefits during disability.   See above citations.

### b.    DEFENDANTS' EMPLOYEE HANDBOOK

Between about 1984 and 1991, class member Geraldine Maier was provided an employee handbook which states in pertinent part:

> 6.20    MEDICAL INSURANCE - If company approves long term disability, you may continue medical coverage as long as disability continues.
> *****
> 8.9    Group life ins. continues, no further premium payment reqd.
> Group health continues, you pay share of reqd. prem.
> LTD continues, no future prem. Payment reqd.
> Pension benefits continue to accumulate.
> Benefits continue until period of disability ends or you retire.

Ex. 25, para. 4 & attachment thereto.

### c.    DEFENDANTS' INDIVIDUALIZED WRITTEN CORRESPONDENCE

Defendants provided individualized and personalized written correspondence to some of the class members which, like the multitude of "template" letters sent from 1991 or earlier through 2004, reflect Defendants' clear understanding that health insurance and other welfare benefits lasted until the end of long-term disability.  For example, a March 27, 2000 letter to Ms. Horner states:

> Your medical benefits will continue as long as your premiums are paid and you are approved for coverage under the long-term disability plan.  Your life and pension benefits will remain active while you are approved for coverage under the long-term disability plan.

Ex. 18, paras. 6 & 7 & attachment thereto.  The author, Donna Thompson, who was the supervisor of Defendants' benefits department, testified in deposition that this was a "personal letter to Barbara Horner" that she had the authority to write and not a template letter.  Ex. 26, pp.

21-22.  She testified that the language used in that letter was language which she decided was appropriate to use in that letter.  Id.  Ms. Thompson explained that she meant to inform Ms. Horner that as long as she paid her premiums and is disabled, her medical benefits will continue.  Ex. 26, p. 22.  Ms. Thompson added, "At the time -- that's the way the plan worked."  Id.

Defendants also sent a letter to class member Barbara Horner informing her that she was only entitled to $50.00 per month disability benefit because the terms of the 1994 summary plan description governed since she became disabled that year.  Ex. 18, para. 8.

On November 20, 1996, class member Lynn Conforti wrote Ms. Thompson a letter specifically inquiring, "What happens to my term life policy, i.e., can I convert it to an individual policy?".  On December 11, 1996, Ms. Thompson who was Great-West's Senior Personnel Benefits Administrator sent Ms. Conforti an individualized letter responding, "While you are on LTD, **you are entitled to keep** your Group Life Insurance coverage with the Company at no charge."  Ex. 19, paras. 7 & 8 & attachment thereto.  Again, the same plan terms applied to life insurance during long-term disability as applied to other welfare benefits during long-term disability.  Same citations as above.

Around 2002, Defendants provided an internal e-mail string to class member Phyllis Porcello in response to her requests for information including an inquiry about the duration of her benefits during long-term disability.  Ex. 27, para. 5 & attachment thereto.  At that time, Great-West suggested Ms. Porcello leave work and take disability.  Id.  The e-mail string contains an April 10, 2002, 8:12 a.m., e-mail from Jennifer Sward who was Great-West's Supervisor of Benefits & Compensation Administration to Lisa Potter who was Great-West's Senior Employee Relations Specialist.  Id.  In that e-mail, Ms. Sward represented, "As long as she is eligible for LTD benefits she will be given the option to continue her current health/dental/

vision coverage at the same rate as active staff." Id.  Again, there was no qualification

concerning Plan amendment.

Even in a very recent March 12, 2007 e-mail, Linda Gordian of Great-West's benefits

department informed class member Daniel Smith:

> In response to your question regarding your Life insurance benefit, this will continue to
> remain in effect as long as you are eligible to receive LTD benefits.  You are eligible for
> both benefits to the end month in which you turn age 65, provided you continue to remain
> disabled as defined by your Plan.

Ex. 28, para. 5 & attachment thereto.  Again, there was no qualification for Plan amendment and

life insurance benefits during disability were subject to the same plan terms as the other welfare

benefits during disability.  Same citations.

### d.     VERBAL REPRESENTATIONS TO CLASS MEMBERS

#### i.     DEFENDANTS' VERBAL REPRESENTATIONS TO CLASS MEMBERS REGARDING THE DURATION OF THEIR WELFARE BENEFITS

Beginning as far back as the early 1980's, Defendants' representatives consistently told

many different class members that their health insurance and other welfare benefits would last as

long as their long-term disability, including the following thirty-eight (38) different instances:

1.     Before 2005, class member Anita Allesi had conversations with Brooke Tracy of
Great-West's benefits department in which she asked Ms. Tracy how long her
benefits would last while she is disabled.  In response, Ms. Tracy told Ms. Allesi
that as long as she is on disability, she will have her benefits.  Ex. 29, para. 5.
2.     About 1999, Great-West's representative told class member Sherlene Anderson
that she would have medical benefits until she went back to work or until she was
deemed not medically disabled.  Ex. 30, para. 5.
3.     Since about 1999 or 2000, Great-West's employee benefits representatives told
Ms. Anderson that she would receive medical benefits as long as she is disabled.
Ex. 30, para. 6.
4.     Class member Marjorie Andrasko was hired by General American in the 1980's.
Great-West took over her office some time around the late 1990's.  Ex. 31, para.
4.  When Ms. Andrasko was first hired by General American, she was told by the
head of personnel that under the company's disability policy she would receive
health insurance and other benefits as long as she was disabled.  Id., para. 5.

When Great-West took over Ms. Andrasko's office, Jean, a woman from Great-West's human resources department, told Ms. Andrasko that she would have the same benefits. Id., para. 6. Around 2000, Jean told Ms. Andrasko that she would get medical insurance as long as she was out on disability. Id., para. 7.

5. Around 2003, Linda Gordian of Great-West's benefits department told class member Gloria Aron that she would have health insurance as long as she is disabled. Ex. 32, para. 5. Ms. Aron believed that Ms. Gordian's statement was consistent with a letter she received from Amy Olschner of Great-West informing her that her benefits will last until she is no longer disabled. Id., para. 6.

6. About 2004, Great-West's Disability Case Worker, Linda Gordian, told class member Jean Bays that she would receive medical benefits as long as she was on disability. Ex. 33, para. 5.

7. About 1998, class member Sharon Bowers asked Great-West's Disability Case Worker, Doris Alves, whether she would still have family health insurance while she was disabled. Ex. 34, para. 5. Ms. Bowers specifically asked Ms. Alves that question because Ms. Bowers' son had health issues at the time and maintaining her health insurance was important to Ms. Bowers. Id. In response, Ms. Alves told Ms. Bowers that she would receive health and other benefits at employee prices as long as she was disabled. Id.

8. Around 2002, Great-West's human resource representative told class member Conley Bowling that health and other benefits would last until his disability ended. Ex. 35, para. 5.

9. Around 1998, Linda Gordian and Doris Alves of Great-West's benefits department both told class member Carol Boytim that she would have medical and other benefits until age 65 or recovery from disability. Ex. 36, para. 6.

10. About 1989, Great-West's representative told class member Angela Denmark and the employees of her office that once they became "vested" with Great-West, they would get all benefits while they were disabled just like active employees. Ex. 37, para. 5. Ms. Denmark believed that statement was consistent with the terms of Great-West's employee benefit plans which she reviewed. Ex. 37, para. 6.

11. About 1980, Great-West's representative, who class member Jeryl Dunn believes to be Sherry Weinstein, Great-West's manager over deferred compensation at that time, told Ms. Dunn that the disability plan paid for health insurance and life insurance until age 65. Ex. 38, para. 5. Ms. Weinstein said that if Ms. Dunn was hit by a bus, Great-West's disability policy would pay for health insurance and life insurance until age 65. Id. Ms. Weinstein said that health insurance could not be terminated while Ms. Dunn was on disability. Id.

12. Before various benefits were taken away around the beginning of 2005, Linda Gordian of Great-West's benefits department told Ms. Dunn that health insurance would be provided until age 65. Ex. 38, para. 6.

13. Around 2000 or 2001, Great-West's Disability Coordinator, Linda Gordian, told class member Mercedes Elayda that she would receive medical, dental and vision benefits as long as she was eligible to receive disability benefits or she reached age 65. Ex. 39, para. 5.

14.     Around 1995, Great-West's benefits representative told class member Venisa Fisher that she would receive health insurance and other benefits as long as she is disabled or until she reaches age 65.  Ex. 40, para. 5.

15.     Since about 1995, Doris Alves of Great-West's benefits department told Ms. Fisher that she would receive health insurance and other benefits as long as she is disabled or until she reaches age 65.  Ex. 40, para. 6.

16.     Someone in Great-West's human resource department told class Member Sherrell Gapsch that she would have health insurance during the entire time that she is disabled.  Ex. 41, para. 5.

17.     Class member Theresa Golding believes that, before 2005, Linda Gordian of Great-West's benefits department told her that medical and other benefits will last as long as she is disabled.  Ex. 42, para. 5.  Ms. Golding believes that statement was consistent with her employee benefits handbook and she believes her version of that employee benefits handbook is from the early 1990's.  Ex. 42, para. 6.

18.     Before 2005, Linda Gordian and possibly other employees from Great-West's personnel department told class member Theresa Gomez that she would have health and other benefits until she reached age 65 or until she recovered from her disability.  Ex. 43, para. 5.

19.     Around 1992, Great-West's "We Care" department told class member Terry Holt that he would always have his health, dental and vision insurance as long as he is disabled.  Ex. 44, para. 5.  That statement was made to Mr. Holt about three or four times by the "We Care" department.  Id. The "We Care" department coordinated communications between Great-West's departments.  Id.

20.     About 2001, class member Karen Hutchins met with Great-West's human resource representative Sherry Garcia about the possibility of her disability leave and benefits.  Ex. 45, para. 5.  Ms. Hutchins specifically asked Ms. Garcia if she would receive health, dental and prescription insurance while she was disabled. Id.  Ms. Garcia assured Ms. Hutchins that she would receive health, dental and prescription insurance until her disability was over or she retired.  Id.

21.     After Ms. Hutchins' long term disability benefits were approved, Ms. Hutchins again asked Great-West's human resource representatives if she would receive health and dental insurance.  Ex. 45, para. 6.  They told Ms. Hutchins that she would receive health and dental benefits until she was no longer disabled or until she retired.  Id.

22.     About 2004, Great-West's Disability Specialist Doris Alvarez assured Ms. Hutchins that she would never need Medicare Part B because she would be covered by medical insurance until she was no longer disabled or until she retired. Ex. 45, para. 7.

23.     About 2001 or 2002, class member Sandra Jackson was told by both Great-West's Senior Disability Specialist Linda Gordian and its Auditor of Group Life & Disability Benefits Nina Incampo, who was also the supervisor over long-term disability, that she would receive health benefits until she is able to go back to work or until she reaches retirement age.  Ex. 46, para. 5.

24.     About 2000 or 2001, Jennifer Sward, who was Great-West's Compensation and Benefits Supervisor, told class member Susan Jennings that she would be covered by Great-West's health plan until she was able to return to work.  Ex. 47, para. 5.

Ms. Jennings believes that Ms. Sward's statement is consistent with a letter she received from Sheila Deligosa dated May 6, 2002. Id.

25. Around 2001, class member LaVashae Lewis was concerned about her health and other benefits. Ex. 48, para. 5. Therefore, Ms. Lewis asked Doris Alves of Great-West's benefits department how those benefits worked. Id. In response, Ms. Alves told Ms. Lewis that she did not need to worry about not having her health insurance while she is disabled as long as she pays the premiums. Id. Ms. Alves told Ms. Lewis that she would have health insurance as long as she was on long-term disability and she paid the premiums. Id.

26. Before 2005, Linda Gordian of Great-West's benefits department told class member Evelyn Messenger that she would have health insurance until the end of her long-term disability. Ex. 49, para. 5.

27. About 2002, Linda Gordian of Great-West's disability benefits department told class member Lisa Morgan that her medical insurance would continue as long as she is on disability. Ex. 50, para. 5. Ms. Gordian also told Ms. Morgan that she would receive the same benefits while on disability as active employees received and nothing would change. Id.

28. Before 2005, Great-West's benefits department told class member Sandra Moscardini that her benefits, including health, dental and vision, would last as long as she is on long-term disability. Ex. 51, para. 5. Ms. Moscardini believes that statement is consistent with a letter she received from Doris Alves, Great-West's Senior Disability Consultant, dated December 21, 2001. Ex. 51, para. 6 & attachment thereto. Ms. Moscardini understood that "continuing benefits" meant that all her benefits, including health, dental and vision, would continue if her long-term disability insurance was approved. Id.

29. During the employment of class member Regina Musso, she was told by her manager, Pat Fry, and other managers that she would receive health insurance throughout her disability up until retirement. Ex. 52.

30. Around 1999, Great-West's benefits department told class member Kevin O'Neill that he would have medical benefits until age 65. Ex. 53, para. 5. Great-West's benefits department made that statement to Mr. O'Neill more than once. Id.

31. Before 2005, Melissa Harris and Nina Incampo of Great-West's human resource department told class member Maria Panlilio that medical benefits would last as long as her disability. Ex. 54, para. 5.

32. Before 2005, Linda Gordian of Great-West's disability department and either Debbie Haines of the disability department or Nancy Bernosky (believed to be the plan administrator) told class member Heather Remington that she would be able to continue her health benefits indefinitely as long as she was on long-term disability. Ex. 55, para. 5.

33. During his employment, class member Richard Robinson reviewed Great-West's Plan document and different versions of its summary plan description including provisions which were the same as or like the section of Great-West's 1997 summary plan description entitled "Can I Continue My Benefits If I Become Ineligible for Coverage under This Plan?". Ex. 56, para. 7. From reading these provisions, Mr. Robinson understood that medical and other benefits lasted as long as disability, until death or until age 65. Id. These provisions were

important to Mr. Robinson because he knew while he was still working that it was likely that he may eventually become disabled. Ex. 56, para. 8. About annually, Great-West sent a benefits liaison to the office at which Mr. Robinson worked to explain the benefit programs. Ex. 56, para. 9. To assure himself that Great-West would abide by these plan provisions, Mr. Robinson asked Great-West's benefit liaisons at these meetings about whether disabled employees receive medical benefits. Id. The benefits liaisons confirmed that medical benefits would last as long as disability lasts, like the summary plan description states. Id.

34.     On her final day of class representative Barbara Schield's employment, the Plan administrator, George Jelfimow, told her that if she was accepted for long-term disability benefits, she would be able to continue her health insurance as long as she was disabled and she would pay the employee price. Ex. 57, para. 2.

35.     Around 2001, class member Hattie Marie Sims was concerned about what would happen to her benefits once she became disabled. Ex. 58, para. 5. Therefore, Ms. Sims asked Linda Gordian who works in Great-West's benefits department what would happen to those benefits while she is disabled. Id. Ms. Gordian told Ms. Sims that she would have her medical, dental and vision benefits as long as she remained disabled. Id. Ms. Gordian also told Ms. Sims that while she is disabled she would have the same benefits she would have if she was still working. Id.

36.     Class member Debra Smith believes that, around 1991, someone from Great-West's benefits department told her that her health benefits will last as long as she is on disability, but she cannot remember who told her that. Ex. 17, para. 7.

37.     On June 21, 2004, class member Daniel Smith discussed his benefits with Great-West's benefits representative, Linda Gordian. Ex. 59, para. 5. At that time, Ms. Gordian told Mr. Smith that his receipt of all benefits was tied to whether he met the definition of "disabled." Id. Ms. Gordian told Mr. Smith that his medical, dental, vision and life insurance benefits will be kept in force until he is no longer disabled or age 65 whichever comes first. Id. At that time, Mr. Smith made a contemporaneous written record of this conversation which reflects:

> Also Confirmed I would be eligible for All benefits (Medical Dental Life Etc.) As long as Disabled 'til age 65, No longer disabled or Death.
>
> I responded saying that GWL covered treatments, and procedures no one else would. And that Gwl's coverage was very important it did not end.
>
> She reiterated that 'You do not need to worry Great West Life will cover you with Medical, Dental, and Life Insurance until you are no longer disabled, or age 65.
>
> I joked 'I will never make it to 65 death will come first.' Linda Replied 'You don't need to worry You will have coverage until 65 or death.' Id. & attachment thereto.

38.     Before 2005, the long-term disability insurance of class member Contance Stathis was taken away and reinstated on different occasions. Ex. 60, paras. 6. Her

medical and other benefits were taken away when her long-term disability benefits were taken away and those other benefits were reinstated when her long-term disability benefits were reinstated.  Id.  When her benefits would be taken away, Ms. Stathis would have conversations with Barbara Ceurvels who was Great-West's Assistant Manager of Group Disability, Jennifer Sward who was the Manager of Group Benefits and Compensation, and Doris Alves who was the Senior Disability Consultant.  Id.  During these conversations, Ms. Ceurvels, Ms. Sward and Ms. Alves told Ms. Stathis that she would have medical and other benefits as long as she was on long term disability.  Ex. 60, paras. 7.  They explained to Ms. Stathis that her medical and other benefits were tied to her long-term disability benefits.  Id.

Jennifer Sward, who was Defendants' benefits supervisor and the plan representative who made many of the above representations, testified that she does not recall any specific conversations with plan participants in which she said that health benefits could be taken away through a plan amendment.  Ex. 21, pp. 43-45.

Additionally, class member Susan Jennings believes that Kurt Hoekendorf, who was Vice President of Great-West, told her that whatever plan was in effect when she left on disability applied to her.  Ex. 47, para. 6.

ii.     **DEFENDANTS' VERBAL REPRESENTATIONS HEARD BY CLASS MEMBERS WHO ALSO ADMINISTERED EMPLOYEE BENEFITS**

Class members who worked in and around Defendants' benefit department provided declarations establishing that Defendants' understanding and practice was to provide health insurance and other welfare benefits until the end of the period of long-term disability and that understanding and practice was repeatedly stated to plan participants.  Those declarations verify:

1.      From about 1988 through about 1990, class member Debra Douglas worked as a disability consultant for Great-West.  Ex. 62, paras. 4 & 5.  During the time Ms. Douglas was a disability consultant for Great-West, she believes that she and the other disability consultants sent letters to the disabled plan participants notifying them that their disability benefits had been approved and stating that employee benefits would continue until recovery from disability or age 65.  Id., para. 6.

2.      During her employment, class member Claudia Hubka heard various human resource and benefits employees state that plan participants on long-term

disability would be covered for medical, dental and vision benefits until they are no longer eligible for disability or they reach age 65.  Ex. 63, para. 5.  The employees who stated such remark included Senior Disability Consultant Linda Gordian, Disability Claims Manager Barb (last name forgotten) and Department Manager David Grant.  Id.  Ms. Hubka heard Ms. Gordian state such remark several times.  Id.

3.  During the first few years of her employment with Great-West, which occurred in or around the 1980's, class member Jean Smith was a customer service representative (CSR).  Ex. 64, para. 5.  As a CSR, Ms. Smith told plan participants that their health benefits would last as long as they were on long-term disability.  Id.  Ms. Smith learned that from Great-West's Preference Manual.  Id.  The Preference Manual was a detailed manual kept by Great-West which instructed Great-West's employees whether and when to pay insurance claims depending on the circumstances.  Id.

4.  Ms. Smith's next position with Great-West was health examiner.  Ex. 64, para. 6.  As a health examiner, Ms. Smith paid claims for Great-West according to the Preference Manual.  Id.  During that time, the Preference Manual said that as long as a participant was totally disabled, Great-West could not terminate their health insurance.  Id.

5.  During a period of time in the 1990's, class member Jackie Carroll was a senior disability consultant for Great-West.  Ex. 61, para. 6.  During that time, Ms. Carroll handled disability benefits for employees of Great -West's customers, but not for Great-West's own employees.  Id.  Ms. Carroll was aware that health benefits lasted during the whole period of disability of the persons whose claims she handled or until they reached age 65.  Id.  She knew that through reading the plan documents, from letters she sent to plan participants as part of her job as a Senior Disability Consultant confirming their disability benefits, and from training she received.  Id.  The letters Ms. Carroll sent to the plan participants stated that health and other benefits would last as long as they were on long-term disability and they could elect COBRA at the end of their long-term disability period.  Id., para. 7.  These letters she sent to participants were intended to notify the disabled plan participants of their rights under their plan documents.  Id., para. 7.  Carol Lone who was the supervisor over the long-term disability department, Nina Incampo who was the trainer, and Gina Goodreau who was a supervisor over the benefits department provided Ms. Carroll training in which she was told that health benefits lasted during the whole period of disability or until age 65.  Id., para. 8.

e.      **PARTICIPANTS' UNDERSTANDING OF PLAN LANGUAGE**

Class members have also provided declarations stating that, from reviewing the plan

documents, they understood that they would receive health insurance and other welfare benefits

as long as they were on long-term disability. [7]  Such declarations establish the following:

1.  Around the end of 2004, class member Sherlene Anderson received a letter from Great-West stating that she would no longer have medical benefits.  At that time, Ms. Anderson read her benefit handbook.  Ex. 30, para. 7.  She believes she read a section of that handbook which was either the same or like the section of Great-West's 2001 benefit handbook attached to her declaration and entitled "When Will Cover under This Plan End?".  Id.  From reading that section of the benefit handbook, Ms. Anderson understood that she would receive her medical benefits until she is no longer disabled.  Id.

2.  Around 1999 or 2000, class member Jean Balish read her benefits book.  Ex. 65, para. 5.  She believes she read a section either the same or like the section of Great-West's 1998 benefit book entitled "When Will Coverage under This Plan End?".  Id.  From reading that benefits book and from her experience as an insurance sales and service agent, Ms. Balish understood that her health insurance and other benefits would continue until the earliest of the end of her disability, non-payment of her premiums, or her 65th birthday.  Id.

3.  Before Great-West discontinued health, dental and vision benefits around the end of 2004, class member Sarah Clarke read a version of Great-West's employee benefits handbook.  Ex. 66, para. 5.  She believes that version is from the late 1980's.  Id.  Ms. Clarke also believes she saw a section of that benefits handbook which was either the same or like the section of Great-West's 1994 benefit book entitled "Can I Continue Benefits if I become Ineligible for Coverage under this Plan?"  Id.  From reading that section of the benefit handbook, Ms. Clarke understood that she would receive her medical, dental and vision benefits until she is no longer disabled.  Id.

4.  Class member Sandra Jackson reviewed a section of Great-West's benefits book which is the same or similar to the section of the 2001 benefits book entitled "Can I Continue Benefits If I Become Ineligible for Coverage Under This Plan."  Ex. 46, para. 6.  From reading that section, Ms. Jackson understood that she would receive health insurance and other benefits until she reached retirement age or until she is no longer disabled.  Id.

5.  Class member Thelma Liggens understood that she would receive health, dental, vision and other benefits until she was no longer disabled, until she retired or until she failed to pay a premium.  Ex. 67, paras 5-7.  She understood this based on a letter from Great-West dated August 30, 2000 and from a section of Great-West's employee benefits book which was the same or similar to the section of Great-West's 2001 benefits book entitled "Can I Continue Benefits If I Become Ineligible for Coverage Under This Plan."  Id.

---

[7] Courts are to interpret plan provisions by giving the terms their "common and ordinary meaning" according to what "an average plan participant would understand the words to mean."  Adams v. Cont'l Cas. Co., 364 F.3d 952, 954 (8th Cir. 2004); Mansker vs. TMG Life Ins. Co., 54 F.3d 1322 (8th Cir. 1995); see also Brewer v. Lincoln Nat. Life Ins. Co., 921 F.2d 150, 154 (8th Cir. 1990); Halbach vs. Great-West, et al., 2006 U.S. Dist. Lexis 36816, at *15-16.  These statements of participants demonstrate their understanding and interpretation of the key terms.

6.    Shortly after class member Geraldine Maier began employment with Great-West around 1984, she reviewed Great-West's employee benefit book.  From that book, Ms. Maier understood that she would be provided health, dental, vision and other types of insurance until she no longer received long-term disability benefits, she died, she reached retirement age or failure to pay premiums.  Ex. 68, para. 5.

7.    Around 1999 or 2000, class member Julline Mickley reviewed a section of Great-West's benefits book which is the same or similar to the section of the 1998 benefits handbook entitled "Can I Continue Benefits If I Become Ineligible for Coverage Under This Plan."  Ex. 69, para. 6.  From reading that section, Ms. Mickley understood that she would receive health insurance and other benefits until she recovered from disability or until she reached retirement age.  Id.

8.    During his employment, class member Richard Robinson reviewed Great-West's plan document and different versions of its summary plan description including provisions which were the same as or like the section of Great-West's 1997 summary plan description entitled "Can I Continue My Benefits If I Become Ineligible for Coverage under This Plan?".  Ex. 56, para. 7.  From reading these provisions, Mr. Robinson understood that medical and other benefits lasted as long as disability, until death or until age 65.  Id.

9.    Before 2005, class member Frances Sharnikow reviewed Great-West's employee benefits manual.  Ex. 70, para. 5.  She understood that manual to mean that her benefits would not be discontinued while she is on long-term disability.  Id.

10.   Around 1995, class member Margaret Sherwood read a version of Great-West's employee benefits handbook.  Ex. 71, para. 5.  She believes she saw a section of that benefits handbook which was either the same or like the section of Great-West's 1995 benefit book entitled "Can I Continue Benefits if I become Ineligible for Coverage under this Plan?"  Id.  From reading that section of the benefit handbook, Ms. Sherwood understood that she would receive her medical, dental and vision benefits until she is no longer disabled.  Id.

11.   Class member Debra Smith understood from her old benefits book that health benefits lasted as long as she was eligible for long-term disability benefits.  Ex. 17, para. 6.

12.   Class member Constance Stathis understood that as long as she was on long-term disability, she would have other benefits such as medical insurance and prescription drug insurance.  Ex. 60, para. 5.  Ms. Stathis understood this from reading Great-West's employee benefits handbook and from statements by Great-West's representatives.  Id.

## f.    PROTESTS OF ELIMINTION OF BENEFITS

Evidence that class members protested the elimination of their health insurance and other benefits demonstrates that the class members understood they were entitled to those benefits.

The Plan Administrator at the time, John Mulski, testified in deposition that, after the amendment, he received telephone calls from plan participants stating that they had the

"template" letters and they understood that they had a "vested" right to continuation of the benefits.  Ex. 73, pp. 18-20.

On November 4, 2004, class member Claudia "Bea" Hubka e-mailed George Bogdeweicz, the author of the notice of elimination of benefits, protesting, "It is unfortunate that Great West cannot honor the specifics of the plan that was in force when I was required to go on LTD."  Ex. 74, para. 5 & attachment hereto.

On November 23, 2004, class representative Barbara Schield wrote Defendants protesting elimination of the benefits she was promised.  Ex. 75, para. 2 & attachment thereto.

On December 9, 2004, plan member Barbara Horner wrote Defendants a letter protesting discontinuation of the benefits.  Ex. 18, para. 6 & attachment thereto.  In that letter, Ms. Horner states that the elimination of benefits is contrary to the September 6, 1995 ("template") letter she received from Great-West and the May 27, 2000 personalized letter she received from Great-West.  Id.; Ex. 18, paras. 5 - 7.

On December 9, 2004, class member Margaret Sherwood, through her attorney Leif Nelson, characterizing the elimination of benefits as "a shock" and requested information and documents.  Ex. 76, para. 5 & attachment thereto.

On December 14, 2005, class member Lata Patel, through her attorney Francis Cristiano, wrote Defendants demanding an explanation of the "foundation" for Defendants' believe that they have the right to terminate the benefits.  Ex. 77, para. 5 & attachment thereto.

 On December 22, 2004, class member Carol Boytim sent an e-mail to Defendants' benefits manager Jennifer Sward informing her, "I have been on Long Term Disability since approximately 1992 and was advised that I could continue my Group Health Benefits until I reach the age of 65 or are no longer disabled."  Ex. 78, para. 5 & attachment thereto.  Ms.

Boytim proceeded to question the legality of eliminating the benefits.  Id.

On February 1, 2005, disabled participant John Lewis, through the undersigned counsel, wrote Defendants requesting to pursue the elimination of benefits through Defendants' administrative appeal process.  Ex. 5, para. 5; Ex. 82.  However, Defendants refused to permit access to that administrative review process.  Id., para. 5; Ex. 83.

**g.      OTHER EVIDENCE OF DEFENDANTS' PRACTICE**

The effort to eliminate provision of health insurance and other benefits to long-term disability benefit recipients began with a June 4, 2004 e-mail from Chelle Dillabough of Great-West to other benefit employees.  Ex. 79; Ex. 80, pp. 35-36; Ex. 81, p. 17.  That e-mail stated:

> **I have recently been made away that we allow all employees who qualify for LTD coverage to maintain health insurance with Great-West through the entire LTD period**.  We do have some participants who are only eligible for LTD for 6 months (substance abuse and mental illness), other are only eligible for 24 months (own occupation disabilities) and other that are eligible to age 65 and beyond (disabled from any occupation).  I think **this practice** is very expensive and could be adjusted to mitigate many expenses.  We know this group is a heavy claims population.  Do you know why we allow this?  Would you have any objections to changing our **policy**?  I am not sure if we would have to grandfather current plan participants or if we could move them to COBRA, I will check that out after I get some feedback on this thought.  Frank, can you quantify and cost savings from this?  Granted they would be on COBRA for 29 or 38 months, but they would be at the CObRA rate so we may have some coverage declines.  Please let me know what you think.

Id. (emphasis added).  The same day, June 4, 2004, Defendants' underwriter Frank Winterer, responded to Ms. Dillabough by e-mail as follows:

> I believe we cover LTD people for medical, since years ago someone saw these people 'needed' coverage, and didn't worry about the extra cost.  Also, I think today (post COBRA) it's not the norm to cover such people for medical, but 20 - 30 years ago, more employers may have done that, and **our decision to cover these people could be 30+ years old.  (I've been at Great-West 26 years, and was the Staff Plan underwriter 20 years ago, and this coverage existed 20 years ago**.)

> To quantify medical costs savings by excluding people covered for LTD requires some estimating.  As you said, this group is probably an above average claim population.  We see COBRA participants are 2 - 3 X the cost of regular members, and this group is

> probably similar.  I would estimate their PEPM [per employee per month] costs at 2 - 3 times regular members, as a result.  If you switch them to COBRA, you keep the claims costs, but generate premium to cover 1X normal members' claims, leaving you with an extra 1 - 2 X normal costs.

Id. (emphasis added).

George Jelfimow, Defendants' former plan administrator testified that during the entire time he worked for Great-West, Defendants provided health insurance to long-term disability benefit recipients until they either reached death, retirement or age 65.  Ex. 20, p. 25.  Mr. Jelfimow was employed by Great-West from 1977 to 2003.  Ex. 20, pp. 6 & 16.

John Mulski, who replaced George Jelfimow as plan administrator and was also the Assistant Vice President of compensation, benefits, and HR systems, testified that, at all times prior to December 31, 2004, long-term disability benefit recipients were allowed to purchase health benefits at employee rates.  Ex. 73, pp. 7-8 & 10-11.

Donna Thompson, supervisor of Defendants' benefits department, testified that the practice of providing health benefits to long-term disability benefit recipients existed since at least 1987 when she began employment with Great-West.  Ex. 26, pp. 11-12.  Ms. Thompson testified that she was not aware that any long-term disability benefit recipient before 2005 was ever denied health benefits unless he or she died, retired, reached age sixty-five (65), or failed to pay premiums.  Id., pp. 24-25.

Ms Dillabough, the current plan administrator testified in deposition that she understands that before January 2005 employees on long-term disability had the ability to continue their medical, dental, vision, prescription drug and life insurance benefits.  Ex. 80, pp. 49-50.

# D.   ARGUMENT

## A.   THE EXTRINSIC EVIDENCE OVERWHELMINGLY SHOWS VESTING OF HEALTH INSURANCE AND OTHER WELFARE BENEFITS FOR THE ENTIRE PERIOD OF LONG-TERM DISABILITY

On June 6, 2006, this Court found that it is "clear" from the language of the reservation of rights clause and termination clause "that some benefits do become vested under the Plan." Thus, the issue now before the Court is "what benefits vest?"  Plaintiffs argue that health insurance and other welfare benefits vest until the end of long-term disability.  Defendants argue that medical claims vest upon the submission of a claim.  The above litany of extrinsic evidence conclusively supports vesting of welfare benefits for the period of long-term disability.[8]

First, the SPD language from 1991 through 1993 is clear and unambiguous.  Under the heading, "What Happens to My Other Benefits When I Am Approved For the Monthly LTD Benefit?," the SPD's discuss continuation of health, dental, vision and life insurance benefits during long-term disability, then these SPD's expressly promises and represent, "**These benefits will continue until the Period of Disability ends or you retire whichever is earlier**."  These are clear and unambiguous promises and representations of the duration of benefits.[9]

In 1994 through 2001 SPD's contain a table entitled, "Length of Time Continuation Coverage Provides Benefits."  Next to the categories of medical, prescription drug, dental, vision and life benefits, the tables promise and represents, "If a person has been approved for LTD benefits, coverage continues during the course of the total disability."  The 2004 SPD similarly represents under the heading, "Continuation of Life Insurance, Medical, Prescription Drug,

---

[8] Even a showing by Defendants that medical claims incurred were vested would not logically or factually negate the showing that health insurance and other welfare benefits also vested.

[9] Statements of duration of a benefit, including statements that benefits will continue until occurrence of an event, indicate vesting.  Jensen vs. Sipco, Inc., 38 F.3d 945, 950 (8th Cir. 1994) (citing Local Union No. 150-A, United Food & Commercial Workers Int'l Union vs. Dubuque Packing Co., 756 F.2d 66, 69-70 (8th Cir. 1985)).

Dental, and Vision Benefits during an Illness or Absence," that "If your Service ends due to Illness and you have been approved for LTD benefits, coverage will continue during the course of the total disability."  The 1994 through 2004 SPD's all qualify that benefits will be discontinued if premiums are not paid.  The phrase, "coverage continues during the course of the total disability," as it appears in the 1994 through 2004 SPD's, may have two (2) possible interpretations:  (1) benefits last until the end of long-term disability or (2) benefits last into the period of long-term disability.  The former interpretation is the more natural and logical.[10] Moreover, the litany of extrinsic evidence set forth above shows that Defendants consistently understood and interpreted such provisions to mean that benefits last until the end of long-term disability and that Defendants' interpretation did not change even after the change in form from the 1993 SPD to the 1994 SPD.

The overwhelming extrinsic evidence shows that the phrase "continues during the course of the total disability" means that welfare benefits continue until the end of long-term disability. That evidence includes:

1.   The dozens, and likely hundreds, of "template" letters sent to plan participants who may qualify for long-term disability from 1991 through 2004 all expressly promised and represented, "The date that you are no longer eligible for Long Term Disability benefits is the date that your benefit coverages also terminate.  At that time, you have the option of continuing your Health, Dental and Visioncare coverage under COBRA."  From 2002 to 2004, such promise and representation was made under the heading, "Health and Life Benefits."  Had Defendants interpreted the SPD language to mean that benefits may only continue until some time partially through the long-term disability period, they certainly would have so stated.

---

[10] The SPD's do not say that welfare benefits "continue into the course of total disability" or that benefits "continue during part of the course of disability."  Defendants could have chosen such language if that was their intent, but Defendants did not do so.  Moreover, if benefits were eliminated mid-way through the "course of disability," then the "course of disability" would continue without benefits, and that would undermine and contradict the language "coverage will continue <u>during</u> the course of the total disability."

2. None of the "template" letters indicates in any way that the promise to continue welfare benefits until the end of long-term disability is subject to Plan amendment.  Obviously, an honest and prudent company would certainly mention such an important qualification for its own protection, if such qualification actually existed.

3. Mr. Jelfimow, who was the long-time Plan Administrator, knew the promise and representation to continue health and other benefits through the entire period of long-term disability was set forth in the "template" letters, but he never tried to remove, change or qualify such promise and representation.

4. Mr. Jelfimow discussed the language of the "template" letters with members of Defendants' benefits committee, the underwriter, and members of his staff.  However, he does not remember telling anyone that such promise and representation of the duration of benefits contained in such letters was incorrect.

5. Defendants' benefits administrator Jennifer Sward, who revised the "template" letters per direction of Defendants' benefits approval committee, never removed, changed or qualified the promise and representation of duration of benefits through 2004.

6. The benefits managers, including Ms. Thompson and Ms. Dillabough, who reviewed changes to the "template" letters never requested removal, change or qualification of the promise and representation of duration of benefits set forth in those letters through 2004.

7. The "template" letters were carbon copied to persons in charge of long-term disability and to managers throughout the company, but nobody removed, changed or qualified the promise and representation of duration of benefits through 2004.

8. More "template" letters were sent to disabled plan participants and carbon copied to management even after the purported amendment took effect on January 1, 2005 and well after this suit was filed.  Those post-amendment letters expressly promise and represent that life insurance is available premium free "while you continue to meet the definition of Total Disability as stated in your LTD Plan, but not beyond your Normal Retirement Date."  Again, the same plan terms governed duration of life, health, dental, vision and prescription drug benefits during long-term disability.  Thus, Defendants have inconsistently interpreted the same plan terms since the purported amendment.  Specifically, since 2005, Defendants state that the same plan terms mean that life insurance will continue "while you continue to meet the definition of Total Disability" but mean that health, dental, vision and prescription drug benefits may be eliminated during long-term disability.  Meanwhile, before 2005, Defendants interpreted the same plan terms consistently with respect to all these benefits.

9. In the post-amendment "template" letters, there is still no qualification of the duration of benefits based upon plan amendment.  Obviously, Defendants would have included such an important qualification if it actually existed, especially after Plaintiffs relied on absence of such qualification in this lawsuit.

10. Defendants expressly promised and represented in their employee handbook, "If company approves long term disability, you may continue medical coverage as long as disability continues" and, just after identifying life and health insurance

benefits, Defendants expressly promised and represented, "Benefits continue until period of disability ends or you retire."  Again, there was no indication that the duration of such benefits depended upon plan amendment, which Defendants would obviously include for their own protection if such qualification had actually existed.

11.   Defendants' individualized and personalized letters to plan participants, ranging from 1996 through 2007, all clearly show Defendants' interpretation and understanding that health insurance and other welfare benefits last until the end of long-term disability.  Notably, these individualized letters were written in response to specific inquiries regarding the length of benefits during long-term disability.  Had there been a qualification of the length of such benefits depending on Plan amendment, Defendants certainly would have mentioned such qualification in their answers to the plan participants' inquiries.  In deposition, Ms. Thompson testified that when she wrote Ms. Horner in 2000, "that's the way the plan worked."

12.   The 1996 personalized and individualized letter to Ms. Conforti expressly promises and represents, "While you are on LTD, **you are entitled to keep** your Group Life Insurance coverage with the Company at no charge."  The anti-divesting language contained in the reservation of rights and termination provisions of the Plan both state that benefits to which participants are "entitled" may not be "divested."  Thus, this letter expressly identifies one of those benefits to which participants are "entitled" and which may not be "divested."  Again, this was Defendants' response to a specific inquiry regarding the duration of benefits.  Had there been any qualification on the length of benefits based on possible Plan amendment, Defendants certainly would have mentioned such qualification in their answer to the inquiry.  Again, the same plan terms govern the duration of life, health, vision, dental and prescription drug benefits during disability.

13.   The April 10, 2002 internal e-mail provided to Mr. Porcello expressly promises and represents, "As long as she is eligible for LTD benefits she will be given the option to continue her current health/dental/vision coverage at the same rate as active staff."  Id.  This was another response by Defendants to a specific inquiry regarding the duration of benefits.  Had there been any qualification on the length of benefits based on possible plan amendment, Defendants certainly would have mentioned such qualification in their answer to the inquiry.

14.   The very recent March 12, 2007 e-mail to Mr. Smith expressly promises and represents, "In response to your question regarding your Life insurance benefit, this will continue to remain in effect as long as you are eligible to receive LTD benefits.  You are eligible for both benefits to the end month in which you turn age 65, provided you continue to remain disabled as defined by your Plan."  This is another response by Defendants to a specific inquiry about the duration of benefits.  Had there been any qualification on the length of benefits based on possible plan amendment, Defendants surely would have mentioned such qualification in their response to the inquiry, especially after Plaintiffs relied on lack of a qualification in this suit.  Again, the same plan terms govern the duration of life, health, vision, dental and prescription drug benefits during disability.

15. Over a period spanning more than twenty (20) years, Defendants verbally represented and promised to over thirty (30) different class members (Allesi, Anderson, Andrasko, Aron, Bays, Bowers, Bowling, Boytim, Denmark, Dunn, Elayda, Fisher, Gapsch, Golding, Gomez, Holt, Hutchins, Jackson, Jennings, Lewis, Messenger, Morgan, Moscardini, Musso, O'Neill, Panlilio, Remington, Robinson, Schield, Sims, Smith (Debra), Smith (Daniel), Stathis) that their health insurance and other welfare benefits would last as long as they were on long-term disability.  These same representations and promises were made by everyone from the Plan Administrator to the benefits department managers to the benefits administrators.  In several instances, class members received such representations and promises from more than one representative of Defendants (Anderson, Boytim, Dunn, likely Holt, Hutchins, Jackson, Musso, Panlilio, Remington, Stathis).  Several of these promises and representations by Defendants to class members were made in response to specific questions regarding the duration of their benefits (Allesi, Bowers, Fisher, Hutchins, Lewis, Robinson, Sims).  Had there actually been a qualification based on possible future plan amendment, Defendants would certainly have qualified their responses to these inquiries.

16. Daniel Smith made a contemporaneous written record of his June 21, 2004 conversation with Ms. Gordian of Great-West which states, "Also Confirmed I would be eligible for All benefits (Medical Dental Life Etc.)  As long as Disabled 'til age 65, No longer disabled or Death … She reiterated that 'You do not need to worry Great West Life will cover you with Medical, Dental, and Life Insurance until you are no longer disabled, or age 65 … I joked 'I will never make it to 65 death will come first.'  Linda Replied 'You don't need to worry You will have coverage until 65 or death."  That record reflects no qualification of benefits based on Plan amendment.

17. Ms. Sward, who was Defendants' benefits supervisor and the plan representative who made many of the above representations, testified that she does not recall any conversations with plan participants in which she said that health benefits could be taken away through a Plan amendment.

18. The Plan's representatives also exhibited their understanding that the version of the plan document in effect at the time that a participant became disabled governed.

19. Ms. Carroll was trained by Defendants as a senior disability consultant to know that health benefits lasted during the whole term of disability or until age 65.  Ms. Incampo, who made some of the above-listed verbal representations and promises to plan participants regarding duration of benefits, was one of those trainers.

20. Ms. Douglas, who worked as a disability consultant for Great-West, believes she and the other disability consultants sent letters to the disabled plan participants notifying them that their disability benefits had been approved and stating that employee benefits would continue until recovery from disability or age 65.

21. During her employment, Ms. Hubka heard various human resource and benefits employees, including disability claims manager Ms. Gordian and Mr. Grant, the benefits department manager, state that plan participants on long-term disability would be covered for medical, dental and vision benefits until they are no longer

eligible for disability or they reach age 65.  Ms. Hubka heard Ms. Gordian state such remark several times.

25. Based on Great-West's claims processing manual ("preference manual"), which stated that health benefits last as long as long-term disability, class member Jean Smith told plan participants that their health benefits would last as long as they were on long-term disability and she paid claims based on that document.

26. The class members who recall reading the SPD's, understood such language to mean that health insurance and other disability benefits last as long as long-term disability (Anderson, Balish, Clarke, Jackson, Liggens, Maier, Mickley, Robinson, Sharnikow, Sherwood, Smith (Debra), Stathis).

27. Multiple disabled plan participants protested the elimination of benefits during disability (i.e. Boytim, Horner, Hubka, Lewis, Schield, Patel, Sherwood).  Plan Administrator John Mulski testified that he received telephone calls from plan participants stating that they had the "template" letters and they understood that they had a "vested" right to continuation of the benefits.

28. The evidence shows that Defendants' maintained a "practice" and "policy" since at least the 1970's of providing health insurance and other welfare benefits through the entire period of long-term disability.  This practice was expressly recognized in the June 4, 2004 e-mails between Ms. Dillabough, Mr. Winterer and other benefits managers and employees.  Former long-time Plan Administrator George Jelfimow testified that such practice was in effect since he began employment with Defendants in 1977.  Mr. Mulski, who succeeded Mr. Jelfimow as Plan Administrator, confirmed such long-standing practice.  Donna Thompson, the benefits supervisor, testified that, between 1987 and 2004, she was not aware of any disabled participant who was ever denied health benefits unless he or she died, retired, reached age sixty-five (65) or failed to pay premiums.

## B.  DEFENDANTS' ARGUMENTS LACK MERIT

Defendants have errantly contended that the 1994 through 2004 SPD language, "If a person has been approved for LTD benefits, coverage continues during the course of the total disability," is the same as the language in Howe vs. Varity Corp., 896 F.2d 1107 (8th Cir. 1990) which provided that health insurance benefits "continue into" retirement.  The language here is easily distinguished from the language in Howe.  First, in Howe the Eighth Circuit found no establishment of a "vesting point" in the language "continue into."  Id., at 1110.  By contrast, the stated "vesting point" here is "approv[al] for LTD benefits."  Second, the language here, unlike in Howe, promises continuation of benefits until a future event, specifically the end of the "course of total disability."  In other words, the SPD's here expressly provide that, when the

"course of the total disability" ends, so do health insurance and other welfare benefits.

Defendants contend that the reservation of rights and termination provisions of the Plan only contain a qualification for "claims in the pipeline."  Even if Defendants are correct, <u>Howe</u> indicates that the health insurance and other benefits sought herein would fall into a "claims in the pipeline" provision.[11]  In <u>Howe</u>, after its analysis of continuation of health benefits to retirees, the Eighth Circuit evaluated whether disability benefits continued after plan termination. Like here, the defendant in <u>Howe</u> contended that qualification to reservation of rights and termination provisions was a "claims in the pipeline" provision.  However, the Eighth Circuit found that disability benefits provided to disabled participants still "fall within" that "pipeline" provision because (1) the disabled plan participants suffered their injury or illness before the plan termination and (2) like here, the plan provided that such disability benefits "may be terminated only upon the employees' death, attainment of age 65, or end of disability, whichever comes first."  <u>Id</u>., at 1110-11 & n. 6.  In <u>Howe</u>, the Eighth Circuit further clarified that, under such terms, and even in the face of plan termination, the disabled participants may be "entitled to continued disability benefits if their disability occurred prior to the plan termination date."  <u>Id</u>. To simplify, the Eighth Circuit found that disability claims were already in the "pipeline" when the disability began before plan termination.  <u>Id</u>.

Here, like the disability benefits considered in <u>Howe</u>, health insurance and other benefit "coverage continues during the course of the total disability," provided premiums are paid.  As in <u>Howe</u>, that "course of disability" ends at the earliest of the date a participant is no longer totally disabled, the date a participant fails to substantiate his or her disability, the date the maximum

---

[11] In <u>Howe</u>, the Eighth Circuit never found that the plan contained a "pipeline" provision.  Rather, the defendant contended it was a "pipeline" provision.  The Eighth Circuit did find that if the plan language was a "pipeline" provision, disability benefits would continue as they were already in the "pipeline."

disability benefits period expires or the date of retirement.  Thus, <u>Howe</u> indicates that the plan here vests health insurance and other welfare benefits, whether the vesting terms in the reservation of rights and termination provisions are characterized as a "claims in the pipeline" provision or not.  Following <u>Howe</u>, the disability claims were already in the "pipeline" when Defendants purportedly amended their Plan effective January 1, 2005.

Defendants mis-rely on a provision of the SPD stating that the Employer may "amend or terminate the benefits provided to you in the plan."  That SPD provision, unlike the Plan itself, does not have any vesting language.  Ex. 1, p. 10.  However, the Plan itself and the SPD's both state that the SPD's terms are subject to the terms of the Plan itself.  Specifically, Section 2.3 of the Plan states, "Coverage for an individual under this Plan as a Participant or a Dependent shall terminate **<u>as set forth in the SPD, except to the extent otherwise specifically provided herein</u>**."  Ex. 1, p. 3 (emphasis added).  Like Section 2.3 of the Plan itself, the SPD's state, "The booklet [SPD] is subject to the rules, regulation, and provisions of the Plan, as approved by the Board of Directors."  Ex. 6, Bates p. 31, Ex. 7, Bates p. 176; Ex. 8, Bates p. 331, Ex. 9, Bates p. 636, Ex. 10, Bates p. 484, Ex. 11, Bates p. 3652.  Therefore, the Plan language, which this Court has already found to show vesting and to restrict plan changes which eliminate vested benefit rights, trumps and supersedes the SPD's language relied upon by Defendants.  Defendants cannot avoid the vesting language of the Plan by ignoring it in favor of language which is itself subject to such vesting terms of the Plan.

Any after-the-fact interpretation of the Plan language by Defendants falls outside the scope of extrinsic evidence recognized by the Eighth Circuit.  See, i.e., <u>Barker II</u>, 193 F.3d at 979-983.  Moreover, such tardy interpretations will most-certainly contradict the wealth of

extrinsic evidence detailed above including Defendants' numerous contemporaneous interpretations and expressions of meaning.

### E.   CONCLUSION

All of the extrinsic evidence overwhelmingly establishes that the applicable plan terms, which were in effect from 1991 through 2004, meant that health insurance and other welfare benefits lasted until the end of long-term disability.  Defendants cannot come forth with evidence showing any genuine issue of material fact regarding the meaning of the plan terms in question.

## II.   COUNT II:  FAILURE TO DISCLOSE ERISA DOCUMENTS

### A.   STATEMENT OF FACTS

Plaintiff Heather Halbach is the representative of the estate of John Lewis.  Mr. Lewis was a disabled plan participant who lost benefits through the purported plan amendment effective January 1, 2005.

On February 1, 2005, Mr. Lewis, through the undersigned counsel, requested Defendants in writing to produce various documents including plan documents, summary plan descriptions, trust agreements, the latest annual report, and contracts and other instruments under which the Plan is established and / or operated.  Ex. 5, para. 5; Ex. 82; Ex.80, pp. 6 - 11.

Mr. Lewis died on March 6, 2005.

On or about March 17, 2005, Defendants wrote the undersigned counsel a letter declining to produce copies of the documents requested on the sole ground that Mr. Lewis had died.  Ex. 5, para. 6; Ex. 83; Ex. 80a, pp. 12-16.

On September 19, 2005, the undersigned, who had been retained by Ms. Halbach as personal representative, again requested Defendants to produce such documents in writing.  Ex. 5, para. 7; Ex. 84; Ex. 80a, pp. 17-18.

On or about November 21, 2005, Defendants finally produced the plan document, summary plan description, trust agreement and latest annual report.  Ex. 5, paras. 8-9; Ex. 85; Ex. 80a, pp. 24-26.  This was the first time any responsive documents were produced.  Id.

## B.   RELEVANT PRIOR RULINGS[12]

By Order issued June 6, 2006, this Court held, "…because the time between the first request on February 1, 2005 and the partial response on November 21, 2005 was more than 30 days, this Court states that Plaintiff has stated a claim for relief."  Halbach, 2006 U.S. Dist. Lexis 36816, at *27-28.

In their third motion to dismiss, Defendants argued adamantly that Plaintiff Halbach lacks standing to pursue an ERISA claim for statutory penalties because Mr. Lewis lacked a "colorable claim" for benefits.  In its May 29, 2007 Order, this Court, after a detailed analysis, held that Plaintiff Halbach, as representative of Mr. Lewis' estate, holds a "colorable claim" for benefits and she was therefore was entitled to receive the documents requested.  Halbach & Schield, 2007 U.S. Dist. Lexis 38801 at *18-23.

On May 29, 2007, this Court concluded, "The fact that Mr. Lewis is deceased, should not excuse Defendants' alleged failure to comply with the statute."  Id., at *23.

Thus, the sole remaining issue is whether the evidence shows any genuine issue of material fact regarding whether or not more than thirty (30) days lapsed between the initial request for ERISA documents and Defendants' production of such documents.

## C.   ARGUMENT

The evidence presented herein establishes absence of genuine issue of material fact regarding the date of the first request for documents (February 1, 2005), the date of the second

---

[12] See fn. 1 above.

request for documents (September 19, 2005), and the first (and incomplete) response to the request for documents (November 21, 2005).  Defendants admit receipt of the document request letters dated February 1, 2005 and September 19, 2007 and they admit that documents were first produced on November 21, 2005.  Simply, Defendants cannot come forth with any evidence to show that they timely produced the documents sought.  As the uncontroverted evidence shows that far more than thirty (30) days lapsed between the first request and Defendants' first production of documents, summary judgment in favor of Plaintiff Halbach is appropriate.

### D.     CONCLUSION

All the evidence overwhelmingly establishes that Defendants failed to timely produce documents in response to Plaintiffs' written requests.  Defendants cannot come forth with evidence showing any genuine issue of material fact regarding their delinquent production.

Respectfully submitted,

WEINHAUS & POTASHNICK
_____/s/ Mark Potashnick_____
S. Sheldon Weinhaus, E.D.Mo # 4670
Mark Potashnick, E.D.Mo. # 35970
11500 Olive Blvd., Suite 133
St. Louis, Missouri  63141
Telephone: (314) 997-9150
Facsimile: (314) 997-9170

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served on the following via the Court's electronic filing system on the date reflected in the Court's electronic filing records:

Michael E. Brown, Esq.     Kutak Rock
Bradley J. Baumgart, Esq.    Kutak Rock
Leslie Greathouse, Esq.     Kutak Rock
1010 Grand Blvd, Ste 500, Kansas City, MO 64106

Marcia Washkuhn, Esq.     Kutak Rock
1650 Farnam St, Omaha, NE 68102

Stephen H. Goldberg      Jorden Burt
Waldemar J. Pflepsen, Jr.    Jorden Burt
Robin Sanders         Jorden Burt
1025 Thomas Jefferson Street, N.W., Suite 400 East
Washington, D.C. 20007

Attorneys for Defendants

By    s/ Mark Potashnick